**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DAVID J. TACEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| v. ) | |
| ) | **No. 15-9094-KHV** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

David J. Tacey appeals the final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Act, 42 U.S.C. §§ 401 et seq. For reasons set forth below, the Court reverses the judgment of the Commissioner.

**I.    Procedural Background**

On May 30, 2012, plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act. He alleged that his disability began on April 15, 2012. See Tr. 10, 90. On August 13, 2012, the agency denied plaintiff's claim. On January 11, 2013, the agency denied plaintiff's claim on reconsideration. On November 25, 2013, an Administrative Law Judge ("ALJ") held a hearing. See Tr. 35-76. On March 6, 2014, the ALJ found that plaintiff was not under a disability as defined in the Social Security Act. Tr. 29. On April 27, 2015, the Appeals Council denied plaintiff's request for review, adopting the ALJ judgment as the final decision of the Social Security Commissioner. Tr. 1-2. Plaintiff appealed to this Court the final decision of the Commissioner.

## II.     Standard Of Review

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084.  Whether the Commissioner's decision is supported by substantial evidence is based on the record as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).  Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).  To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

## III.    Framework For Analyzing Claims Of Disability

Plaintiff bears the burden of proving disability under the SSA. Wall, 561 F.3d at 1062.  Plaintiff is under a disability if he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  In the first three steps, the Commissioner determines (1) whether plaintiff has engaged in substantial gainful activity since the alleged onset, (2) whether he has a severe

impairment or combination of impairments and (3) whether the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51. If plaintiff satisfies steps one, two and three, the Commissioner will automatically find him disabled. If plaintiff satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ must make specific factual findings regarding plaintiff's abilities in three phases. See Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996). First, the ALJ determines plaintiff's physical and mental residual functioning capacity ("RFC"). Id. at 1023. Second, the ALJ determines the physical and mental demands of plaintiff's past relevant work. Id. Third, the ALJ determines whether despite the mental and/or physical limitations found in phase one, plaintiff has the ability to meet the job demands found in phase two. Id.; Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993). If plaintiff satisfies step four, i.e. if plaintiff shows that he is not capable of performing past relevant work, the burden shifts to the Commissioner to establish that plaintiff is capable of performing other work in the national economy. Williams, 844 F.2d at 750-51.

**IV. Facts**

The following is a brief summary of the evidence presented to the ALJ.

A.   Medical Evidence

Plaintiff has a history of neck and back pain. See Tr. 603-26, 708-13, 739-41. In 1983, plaintiff suffered a left clavicle fracture in a motor-cross racing accident. Tr. 592. In 1984, plaintiff had surgery to repair his right AC joint after separating his shoulder. Tr. 600.

In 1997, plaintiff had a cervical laminectomy at levels C3-6. Ex. 1F at 2. From December of 1997 through March of 1999, plaintiff received physical therapy for his neck pain. Beginning in 1999, various doctors have treated plaintiff's neck pain with epidural steroid injections ("ESIs"). From

January of 2000 until the present, Dr. Melanie Smith has treated him for pain with chiropractic techniques which plaintiff found beneficial.

From 2009 to 2013, Dr. Daniel Bruning and Dr. Jonathan French treated plaintiff for neck, shoulder and back pain.  On February 11, 2009, plaintiff reported that to relieve constant pain he had taken Advil, Aleve, Naproxen, Etodolac and Hydrocodone.  Dr. Bruning diagnosed plaintiff with cervicalgia, cervical disc displacement, spondylosis, stenosis and post-laminectomy syndrome. Dr. Bruning administered a series of ESIs.  Ex. 6F at 60.  Plaintiff followed up with Dr. Bruning twice in February of 2009 and reported that the injections resulted in minimal to 30 per cent pain relief.  Id. at 54, 56.

In April of 2010, plaintiff underwent radio frequency ("RF") ablation treatment.  On June 22, 2010, plaintiff told Dr. French that he was doing very well and was "at least 50% better."  Ex. 9F at 59-63.  Plaintiff also reported he was very active: he swam three times a week, bicycled 60 miles a week and played golf and basketball.  Plaintiff stated that he experienced pain "only after being very physically active."  Id.

Between July of 2010 and May of 2011, Dr. Bruning administered several ESIs to plaintiff for lower back, hip and buttock pain.  See Ex. 6F at 42, 71.  Plaintiff generally reported that the ESIs relieved from 40 to 70 per cent of his pain for several months at a time.

On June 8, 2011, Dr. French performed RF ablation on plaintiff's lumbar spine.  On August 1, 2011, plaintiff reported that his low back and neck pain was 50-60 per cent better.  Ex. 5F at 134-37. Dr. French noted that plaintiff had 5/5 strength in all muscle groups.  Dr. French continued plaintiff on Naproxen for pain and Flexeril for a muscle relaxer.

On November 30, 2011, Dr. Bruning administered a lumbar ESI. On December 1, 2011, Dr. French noted that plaintiff was doing quite well, although he had a flare of pain after playing 36 holes of golf, for which Dr. Bruning had given him the most recent ESI. Ex. 5F at 42.

On December 28, 2011, plaintiff reported that he had 65 per cent improvement in pain over the last three weeks but still had some low back and leg pain. Dr. Bruning administered another lumbar ESI.

In March and April of 2012, Dr. French treated plaintiff with additional RF ablation. Beginning in March of 2012, plaintiff reported consistent pain improvement. See Ex. 5F at 30-36.

In May of 2012, plaintiff told Dr. Bruning that his medical insurance had expired and that he would seek medical care at the VA. Ex. 6F at 63.

In September of 2012, plaintiff told Dr. French that he was very pleased with his pain relief and only rarely used Naproxen, Flexeril or Tramadol for pain. Ex. 10F at 6-7. He reported that he was still an avid golfer. On December 20, 2012, Dr. French administered ESI.

On March 30, 2013, Dr. French performed RF ablation on plaintiff's lumbar spine. On April 11, 2013, plaintiff obtained a TENS unit to treat pain. Ex. 14F at 29-30. On May 9, 2013, plaintiff stated that he did intense aerobic exercise several times a week.

On August 1, 2012, Dr. Sara Ackermann conducted a consultative physical examination of plaintiff. Ex 8F. Dr. Ackermann diagnosed plaintiff with diabetes, osteoarthritis, degenerative disk disease, radiculopathy and a history of acoustic neuroma. She opined that plaintiff could work at a light level of physical exertion with certain limitations in overhead lifting due to a limited range of shoulder and cervical spine motion. She concluded that in an eight-hour workday, plaintiff could sit for one to two hours at a time, stand for two to three hours at a time and walk for three to four hours at a time. He could lift and carry 25 pounds frequently and 30 pounds occasionally. Ex. 8F at 4.

In September of 2012, the VA assessed plaintiff with a combined service-connected disability rating of 80 per cent as of February 15, 2011 based on the following conditions: right and left upper extremity radiculopathy; degenerative disc disease/cervical spine; osteoarthritis right shoulder; residual fracture of left clavicle; degenerative disc disease/osteoarthritis lumbar spine; osteoarthritis right knee; osteoarthritis, right hip; and left lower extremity radiculopathy. Ex. 1E, 2E.

On October 9, 2012, Dr. Paul Kindling, state agency medical consultant, opined on plaintiff's RFC as follows: claimant can lift and/or carry ten pounds frequently, 20 pounds occasionally; stand and/or walk for a total of four hours and sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs; never climb ladders/ropes/scaffolds; occasionally stoop, kneel, crouch and crawl; occasionally reach overhead bilaterally; and must avoid concentrated exposure to noise, vibration and hazards. Ex. 4A at 12-14.

B.      Plaintiff's Testimony

On November 25, 2013, plaintiff testified before the ALJ as follows:

He was born on May 17, 1958 and was 53 years old on April 15, 2012, his alleged disability onset date, and 55 years old on the day of his initial hearing. Tr. 39, 132, 160. Plaintiff attended two years of college and served in the military service for ten years. Tr. 40, 185, 260.

From October of 1993 until October of 1998, plaintiff worked as a lead cable television technician. Tr. 334. He tested and troubleshot cable installation and spent 80 per cent of his work day in a bucket lift. He also carried cable equipment up and down telephone and power poles. Tr. 336.

From October of 1998 until December of 2010, plaintiff worked as a video project manager. Tr. 430. He spent about 70 per cent of his time conducting "site surveys," developing engineering cost estimates and meeting with customers. Tr. 431. He spent the rest of his time on administrative duties and acquiring floor space to build projects. His employer allowed him to work from home, which

allowed him to successfully perform his job because he could lay down to take breaks after about an hour of work. Tr. 49.

In December of 2010, plaintiff's employer discontinued the video project manager position and transferred him to a senior real estate manager position. Tr. 430. Although the new position involved the same job duties, his employer no longer allowed plaintiff to work from home. Because he could not rest or lie down during his work day, he could only perform two hours worth of work during an eight or ten-hour day. Tr. 50. For this reason, plaintiff left his job on April 15, 2012.

Plaintiff currently works ten hours a week consulting on cable television projects for a friend's company. Tr. 39, 41. He breaks his work into 30-minute segments separated by periods of rest. Tr. 48. He rejected an offer of a full-time position because he can only manage ten hours a week.

Plaintiff had surgery on his neck in 1997 but still has neck, lumbar and cervical spine pain. He has tried various methods to control his pain, including physical therapy, exercise, ESI, RF ablation, chiropractic treatments and oral pain medications including Vicodin, Cyclobenzaprine and Naproxen.[1] The pain medication makes it hard to concentrate, and the pain impairs his ability to function on a day-to-day basis; the "majority of the time," he has "incapacitating pain." Tr. 46.

Since April of 2012, plaintiff has received three or four epidurals; he typically derives six months of pain relief from them. Vicodin is also effective, and RF ablation treatments for his lower back take his pain level from an eight or nine down to a five. Tr. 54.

Plaintiff currently lives in a ranch style house with his girlfriend. He does not attempt to do any type of lifting from the floor to his waist because "just to bend over to tie . . . or pick up [his shoes] [causes him to] pay the price" and keeps him in bed for up to a week. Tr. 53. He can only walk two or

---

[1] Neck exercises help his neck feel better, but "it does not stay that way." Tr. 51.

three blocks on a level surface before becoming tired and worn out. He used to be an avid golfer but his physical ability had decreased during the past four years. He played golf only five or six times during the past year, the last time about a month and a half ago. Tr. 60.

Last year, plaintiff drove to Albuquerque with his girlfriend and only spent around 60 to 75 minutes in the car at a time. Tr. 61. In May of 2013, plaintiff went on a two-week vacation to Puerto Rico but he will not do that again because being confined on a plane was a "little too much to take." Tr. 60-61. On arrival, he had to lie down and relax for a couple of days. Tr. 61.

### C. Third Party Function Report

On June 21, 2012, plaintiff's girlfriend, Deborah Palmisano, completed a third party function report. See Ex. 6E. She reported that plaintiff's back hurts and he is irritable. Palmisano indicated that plaintiff performs daily activities including chores around the house and sometimes mows the grass. She noted that he can walk about three blocks and can stand for 45 minutes, but he can no longer do many sports that he loved to do. Palmisano stated that plaintiff golfs when he is not in pain, goes to lunch with friends and travels with her.

### D. Vocational Expert Testimony.

The vocational expert testified that plaintiff's past job as a video engineer corresponded most closely to the Dictionary of Occupational Titles ("DOT") entry 194.362.018 – Telecine Operator. See Dictionary of Occupational Titles, 194.362.018 (4th ed. 1991), available at 1991 WL 671560. The DOT describes a Telecine Operator in the radio and television broadcasting industry, as follows:

> Controls equipment, such as tape recording and playback units, film projectors and slide projectors in television broadcasting studio, synchronizing equipment with program content and activities of other technical personnel to maintain prescribed professional standards. Threads film or tape through equipment and inserts slides in slide projector. Installs, adjusts and repairs equipment to facilitate uninterrupted service during broadcast.

Plaintiff's Brief (Doc. #10), Ex. A. The DOT further describes Telecine Operator as a skilled, sedentary job requiring few people skills and no climbing, balancing, stooping, kneeling, crouching, crawling or exposure to weather, cold, heat or humidity. Id.

The vocational expert acknowledged that the DOT was not current as to technical jobs. The vocational expert testified that as plaintiff performed it, the videotape job was "light" work, but categorized as "sedentary" under the DOT entry for Telecine Operator. Tr. 65. The expert also testified that plaintiff performed past work as a construction engineer manager, categorized as a light job that is highly skilled. Tr. 30.

The ALJ asked the vocational expert to assume a hypothetical claimant with the following limitations:

> Able to lift twenty pounds occasionally and ten pounds frequently; Able to sit, stand, or walk up to six hours per day in each position; Able to occasionally climb ramps and stairs; Unable to climb ladders, ropes, or scaffolds; Able to occasionally stoop, kneel, crouch, or crawl; Unable to perform overhead reaching; Able to frequently handle and finger. Must avoid exposure to excessive vibration.

Tr. 66-66.

The expert opined that because plaintiff's work is considered sedentary, a hypothetical individual with plaintiff's age, education, past relevant work experience and RFC could perform the video engineer job both as plaintiff performed it, based from home, and as it is generally performed. Tr. 66. The vocational expert acknowledged that it was difficult to provide an accurate DOT job code for highly technical jobs because the DOT was last updated in 1977. Tr. 70-72, 75. The vocational expert further acknowledged that because plaintiff was allowed to perform the job of video engineer at home, he had the flexibility to alternate between standing and sitting at will but he would not have that ability if the work was done in the open labor market. Tr. 72-73. Further, in the open labor market plaintiff would not have the ability to lie down during the day unless it was done during employee break time. Tr. 73.

The expert also testified that if the hypothetical claimant were limited to the performance of simple, repetitive instructions he could not perform any of the claimant's past work or any of the jobs previously identified that could be performed using the claimant's transferrable skills. Tr. 74. Finally, if the hypothetical claimant had deficits in his attention and concentration that totaled two and one-half hours or more per day, he could not perform any job. Tr. 74-75.

### V.     ALJ Findings

> 1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2.     The claimant has not engaged in substantial gainful activity since April 15, 2012, his alleged onset date.
>
> 3.     The claimant has the following severe impairments: cervical and lumbar spine spondylosis; status post cervical spine fusion surgery; osteoarthritis of the right shoulder; status post healed fracture of left mid clavicle; osteoarthritis of the right hip; mild osteoarthritis of the left ankle.
>
> 4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526).
>
> 5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and SSR 83-10, involving occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and/or walking up to 6 hours in an 8-hour workday, and sitting up to 6 hours in an 8-hour workday. However, he has the following exertional and nonexertional limitations that reduce the claimant's capacity for light work: occasionally stoop, kneel, crouch, or crawl; avoid overhead reaching; frequently handle and finger; avoid exposure to excessive vibration; and he needs to alternate sitting and standing at least every hour. * * *
>
> I give significant weight to Dr. Ackermann's opinions regarding the claimant's functional limitations because they are supported by the objective medical records in evidence
> and the claimant's reported activities of daily living, including traveling and golfing, but I have modified the claimant's limitations set forth in his determined residual functional capacity to account better for the claimant's subjective complaints. * * *

The claimant's testimony was marked with inconsistencies regarding the severity of his functional limitations, which have an adverse effect on the credibility of his disability allegations. For example, the claimant testified that his level of pain is incapacitating the majority of the time, but this assertion is totally contradictory with the respective pain levels he reported to his treating medical care providers during the period being adjudicated. This assertion is completely insistent with activities that he reported to his providers, as noted above, including playing golf, swimming, and intense aerobic exercise. He reported that he was doing intense aerobic exercise several times a week as of May of 2013, as set forth above. It is clear from treatment notes and the claimant's testimony that he is an avid golfer and has continued to play golf since his alleged onset date. His travel to Puerto Rico and Albuquerque is also inconsistent with his claim of disabling pain. His testimony about his extreme limitations is also inconsistent with his activities of daily living, especially his current work at Optic Links as a consultant on cable TV design work for 10 hours a week, 40 hours a month. Although this work activity does not rise to the SGA level, it shows that the claimant is able to work. He reported to Dr. Acke1mann that he is able to take care of his activities of daily living, including cooking, cleaning, dressing, bathing, and doing household chores. If the claimant's medical conditions were as disabling as he reports them to be, then his activities would be more severely restricted. * * *

As fo the opinion evidence not already addressed above, I give partial weight to the opinions of the State agency medical consultant, Dr. Kindling, regarding the claimant's physical residual functional capacity (Exhibit 4A, pp. 12-14). [] However, I find that the claimant's activities of daily living support greater exertional abilities than opined by Dr. Kindling, and that many of the nonexertional limitations opined by Dr. Kindling are not warranted based on the claimant's testimony. I give little to no weight to the disability rating assessed by the VA (Exhibits lE, 2E). The VA's disability rating process is a completely different standard than the Social Security Administration's disability standard for adjudication of disability insurance benefits in this case. Moreover, as noted above, a disability finding is inconsistent with the claimant's varied activities of daily living.

Pursuant to SSR 06-3p, I have considered the third party function report submitted by the claimant's friend who lives with him, Deborah Palmisano, on June 21, 2012 (Exhibit 6E). Ms. Palmisano corroborated some of the claimant's testimony regarding his daily activities, but she also reported that the claimant is able to perform a high level of daily activities, including doing chores around the house, mowing the grass, golfing, going to lunch with friends, and traveling with her. These activities are inconsistent with the claimant's testimony that his level of pain is "incapacitating the majority of the time." Thus, partial weight is given to Ms. Palmisano's statement.

In sum, the evidence in this case shows that the claimant is not precluded from all work. There is nothing in the record to show that the claimant cannot perform work within the limitations set forth in his determined residual functional capacity.

> 6. The claimant is capable of performing his past relevant work as a video tape engineer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). * * *
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2012, through the date of this decision (20 CFR 404.1520(f)).

Doc. #4-4 at 13-17, 28-30.

## VI.     Analysis

Plaintiff asserts that the ALJ erred in (1) evaluating his credibility and thus erroneously determining plaintiff's RFC and (2) finding that plaintiff was not disabled at step four. Defendant contends that the ALJ decision is supported by substantial evidence.

### A.     Credibility

Plaintiff asserts that the ALJ failed to properly evaluate the credibility of his assertions of limitations caused by subjective complaints of pain.

Courts generally treat ALJ credibility determinations as binding on review. Wilson, 602 F.3d at 1144-46; Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). (credibility determinations peculiarly province of fact finder and reviewing court will not overturn if supported by substantial evidence). The Court usually defers to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

The Tenth Circuit has explained the analysis for considering subjective testimony regarding symptoms, as follows:

> A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain. This court has stated: The framework for the proper analysis of Claimant's evidence of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's

>subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

Thompson, 987 F.2d at 1488 (dealing specifically with pain) (further citations and quotation omitted).

For evaluating symptoms at step three of the framework, courts have set out a non-exhaustive list of factors which include the following:

>the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489); see Luna, 834 F.2d at 165-66; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff asserts that the ALJ (1) did not credit plaintiff's attempts to obtain treatment for pain or his long work history and (2) mistakenly equated plaintiff's daily living activities as evidence that he could perform full-time employment.

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause pain. See Doc. #4-4 at 21. The ALJ recited in great detail the medical treatment which plaintiff had received for neck, shoulder and back pain. The ALJ cited medical evidence, including numerous treatments and results of ESI and RF ablation. The ALJ noted the specific medications which plaintiff takes for pain. The ALJ found that although plaintiff testified that most of the time his level of pain is incapacitating, this testimony contradicts the pain levels that he reported to medical providers during the relevant period. The Court finds that the ALJ adequately considered the subjective complaints of pain and that the record supports her determination on this issue.

As to work history, the ALJ noted that plaintiff had an excellent work history with a high level of earnings over the 15-year period before his alleged onset date. The ALJ acknowledged that this

demonstrates a motivation to work and "has a positive effect on his credibility." Doc. #4-4 at 29. The ALJ noted that work history is only one of many credibility factors, however, and found that other credibility factors outweighed it.

Moreover, the ALJ found that plaintiff's complaint of constant pain was inconsistent with activities – including golf, swimming, intense aerobic exercise, cooking, cleaning, dressing, bathing, and household chores – that he reported to providers. See Doc. #4-4 28-29. The ALJ further noted that plaintiff had traveled to Puerto Rico and Albuquerque, which the ALJ found inconsistent with his complaints of pain. The ALJ then found that plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. The record supports the ALJ's determination as to plaintiff's credibility.

B.   Step Four Determination - Reliance On Vocational Expert Testimony

Plaintiff next argues that the ALJ erred at step four in finding that he is capable of performing past relevant work. At step four, the ALJ must make factual findings regarding plaintiff's abilities in three phases. See Winfrey, 92 F.3d at 1023-25. First, the ALJ determines plaintiff's physical and mental RFC. Id. at 1023. Second, the ALJ determines the physical and mental demands of plaintiff's past relevant work. Id. Third, the ALJ determines whether despite the mental and/or physical limitations found in phase one, plaintiff has the ability to meet the job demands found in phase two. Id.; Henrie, 13 F.3d at 361; see 20 C.F.R. § 404.1520(a)(4)(iv).

At the first phase of step four, the ALJ found that plaintiff had the RFC to perform light work involving occasionally lifting 20 pounds, frequently lifting ten pounds, standing and/or walking up to six hours in an eight-hour workday, and sitting up to six hours in an eight-hour workday with the following exertional and nonexertional limitations: occasionally stoop, kneel, crouch or crawl; avoid

overhead reaching; frequently handle and finger; avoid exposure to excessive vibration; and needs to alternate sitting and standing at least every hour.

The second phase of step four requires the ALJ to determine the physical and mental demands of plaintiff's past relevant work. Plaintiff contends that the vocational expert improperly classified plaintiff's past relevant work and that as a result the ALJ did not accurately determine the physical and mental demands of that work.

A vocational expert may supply information to the ALJ about the demands of the claimant's past relevant work. Winfrey, 92 F.3d at 1025 (citations omitted). The ALJ may rely on the DOT description of a job as "presumptively applicable" to the claimant's past relevant work. See Doyal v. Barnhart, 331 F.3d 758, 761 (10th Cir. 2003) (ALJ properly relied on vocational expert testimony, which characterized claimant's past work in terms of DOT). A claimant may overcome this presumption by demonstrating that the duties in his particular line of work were not those envisioned by the drafters of the category. Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1051-52 (10th Cir. 1993).

Here, the vocational expert testified that plaintiff's past work as a videotape engineer corresponded most closely to the entry for Telecine Operator, which the DOT describes as follows:

> Controls equipment, such as tape recording and playback units, film projectors and slide projectors in television broadcasting studio, synchronizing equipment with program content and activities of other technical personnel to maintain prescribed professional standards. Threads film or tape through equipment and inserts slides in slide projector. Installs, adjusts and repairs equipment to facilitate uninterrupted service during broadcast.

Plaintiff's Brief (Doc. #10), Ex. A. The DOT further describes Telecine Operator as a skilled, sedentary job requiring few people skills and no climbing, balancing, stooping, kneeling, crouching, crawling or exposure to weather, cold, heat or humidity. Id. The vocational expert testified that plaintiff's past work as a video engineer was "light" work as plaintiff performed it, but "sedentary" under the DOT entry for

Telecine Operator. Tr. 65. The vocational expert testified that a person with plaintiff's RFC could perform plaintiff's past job as a videotape engineer both as plaintiff performed it and as that job is generally performed.

Plaintiff correctly points out that his job as a videotape operator as he actually performed it or as it is generally performed in the national economy is not consistent with the DOT Telecine Operator entry on which the vocational expert relied. Plaintiff and his employer detailed his job duties as performing site surveys and developing engineering cost estimates for various satellite video projects, working directly with customers to assess their needs, providing design and project management and monitoring work by subcontractors. These duties are distinctly different from the Telecine Operator job. Plaintiff thus rebutted the presumption that the DOT Telecine Operator correctly identified the duties of his past occupation. See Andrade, 985 F.2d at 1052 (plaintiff may rebut presumption that DOT description applies if duties of claimant's particular line of work "not those envisaged by drafters").

At phase three, the ALJ determined that plaintiff's RFC would permit him to perform his past relevant work as a videotape engineer. The ALJ based this finding on vocational expert testimony which relied on an incorrect DOT job category. Because the ALJ's decision is not supported by substantial evidence, the Court finds that the case must be reversed and remanded for further proceedings.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's decision and **REMANDING** for further proceedings in accordance with this memorandum and order.

Dated this 10th day of March, 2017 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge